UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Nicholas Dennen,

Civ. File No. 00-2731 (PAM/RLE)

Plaintiff,

v.

**MEMORANDUM AND ORDER**

City of Duluth, S.R. Peterson,
and John Does,

Defendants.

---

Plaintiff Nicholas Dennen alleges that he suffered severe injuries as a result of the unreasonable and excessive force used by a Duluth police officer and his canine partner. Dennen has filed suit against the police officer, Defendant Steven R. Peterson, and the city of Duluth, claiming a violation of his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 and various intentional and negligent torts.[1] This matter is before the Court on Defendants' Motion for Dismissal and Summary Judgment. Specifically, Duluth seeks dismissal of Dennen's constitutional claims against it and summary judgment on Dennen's state-law claims against it. Alternatively, Duluth seeks summary judgment on all of Dennen's claims against it. Peterson seeks summary judgment on all of Dennen's claims against him. For the following reasons, the Court grants Defendants' Motion for summary

---

[1] Dennen has conceded that his intentional tort claims are barred by the statute of limitations. The Court, therefore, dismisses those claims with prejudice.

MAY 01 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD MAY 01 2002
DEPUTY CLERK

judgment.[2]

**BACKGROUND**

At the outset it is important to note that there are only two witnesses to the events underlying this action: Dennen and Officer Peterson. Dennen, however, claims that he has no memory of the events at issue. Accordingly, this is an unusual case because most of the material facts are presented by Defendants and stand uncontroverted.

At the time of the events precipitating this action, Dennen was a 20-year-old college student attending the University of Minnesota-Duluth. He was a member of the football team and was a good student, maintaining approximately a 3.5 grade point average. On the evening of September 26, 1998, Dennen attended a party at which he admittedly consumed alcohol and became intoxicated.

Defendants claim that Dennen had been arrested on two previous occasions for underage drinking and had been convicted at least once. Dennen knew that if he was arrested again for underage consumption, the potential fine would increase. Additionally, Dennen has testified that if his football coach had learned that he was drinking, he would have faced discipline that might have included additional conditioning exercises.

On September 27, 1998, at approximately 2:30 a.m., Dennen was walking up 13th

[2] Although Duluth may be entitled to a dismissal of Dennen's constitutional claims pursuant to Fed. R. Civ. P. 12(b)(6), the Court finds that, in any event, Dennen's claims cannot survive summary judgment. Accordingly, for the purposes of this Order, the Court will address Dennen's claims against Duluth using the standards for summary judgment.

Avenue East in Duluth. Peterson was on routine patrol with his canine partner in his patrol vehicle at that time. He passed Dennen and allegedly thought that he saw something in Dennen's hand. According to Peterson, Dennen moved his hand in a manner that indicated that he was trying to conceal what he was carrying. Peterson turned his vehicle around to get a closer look. As Peterson was making a U-turn, Dennen started to run in the opposite direction. Peterson lost sight of Dennen and decided to get out of his patrol vehicle to investigate. Peterson took his canine partner, Citus, with him for his own protection, because it was dark and he was alone in a neighborhood that has a reputation for criminal activity. Peterson, however, has testified that he was not using Citus to track or apprehend Dennen. In any event, Citus was off leash.

Peterson and Citus began to look for Dennen. After a few moments, Citus stopped and indicated that he had picked up a human scent from an unexpected direction, moving towards the woods. Peterson and Citus changed course to follow this scent. Citus got some distance ahead of Peterson, and Peterson commanded him to return just as Citus was entering the edge of the woods. It is unclear from Peterson's account how far into the wooded area Citus had actually gone and whether Peterson maintained visual contact with Citus. On command, however, Citus did return to Peterson and Peterson leashed him.

At this point, Peterson and Citus were standing about 25 feet from the edge of the woods. Peterson then heard movement from the brush. He identified himself as a police officer and announced that he had a police dog with him. He ordered the person in the

woods to come out. The person, presumably Dennen, made no verbal contact, but shortly after Peterson's announcement, Peterson heard the sounds of breaking brush and a loud crash. Following the crash, there were no further sounds. Peterson and Citus entered the woods.

Peterson avers that the ground was muddy, steep, and very dangerous. After a few feet, Peterson and Citus came to the edge of a deep ravine. They descended about 15 feet before they were able to see a creek bed approximately 35 feet below them. From this vantage, Peterson could see Dennen lying in the water. Peterson notified the police radio dispatcher and requested immediate medical assistance. Officers arriving on the scene were able to rescue Dennen.

Following this incident, Dennen was in a coma for several weeks and suffered a traumatic brain injury. He spent more than a year in rehabilitation, and, although he has regained many of his physical and mental abilities, it appears that he still suffers from some of the effects of the brain injury. On December 19, 2000, Dennen filed the instant action against Peterson and Duluth.

The key factual dispute in this case centers on whether the police canine, Citus, caused Dennen to fall down the ravine. Dennen contends that Citus actually made contact with him, biting his arm and back. There seems to be little debate that Dennen had scratches and currently has scars on his arms and back that resulted from injuries sustained on September 27, but there is a good deal of debate about the cause of those injuries. Because Dennen has

no recollection of the events of September 27, his allegation that Citus caused his injuries is based primarily on the expert opinion of Vanness Bogardus, a retired Los Angeles County deputy sheriff who has served as a canine handler and trainer in a number of jurisdictions and who has testified as an expert on the training and supervision of police dogs and the training of police officers as dog handlers. To arrive at his opinion, Mr. Bogardus examined pictures of Dennen's arms and back taken shortly after the events of September 27. According to Mr. Bogardus, the injuries are consistent with the training of police dogs to bite the arms of a target and the defensive posture of a person fending off a dog attack.

As circumstantial support for his claim, Dennen also points out that there are at least two other instances of aggression by Citus. On the first occasion, which occurred in the spring of 1998, Citus attacked a kennel worker. On the second occasion, occurring sometime after the incident with Dennen, Citus, apparently without provocation, attacked Peterson's daughter. Peterson also testified that he spoke with Lesli Furo, a kennel owner, about problems that he was having with Citus showing food-related aggression toward members of his family.

Mr. Bogardus contends that this aggressive behavior evidences a high rank drive in Citus. In other words, Mr. Bogardus argues that Citus was likely trying to assert himself as pack leader. At the very least, Mr. Bogardus claims that Citus' aggressive behavior demonstrates that he was resistant to domestication and subordination.

Defendants contend that Citus did not make contact with Dennen. They argue that

Peterson would have seen or heard any such contact. Additionally, Defendants' own expert claims that Dennen's injuries are not substantial enough to represent injuries sustained from a large police canine like Citus. The injuries, Defendants imply, were likely caused by branches and rocks as Dennen fell down the ravine.

**DISCUSSION**

**A. Summary Judgment Standard**

Rule 56(c) provides that a motion for summary judgment shall be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996)

If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953,

957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., 475 U.S. at 586.

**B. Constitutional Claims**

Dennen alleges constitutional violations against both Peterson and Duluth. These claims are predicated on 42 U.S.C. § 1983, which provides in pertinent part that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. To make out a prima facie case under § 1983, a plaintiff must show that: (1) the alleged wrongful conduct was committed by a person acting under color of law; and (2) the conduct deprived the plaintiff of some right, privilege, or immunity secured by the Constitution or laws of the United States. Collins v. City of Harker Heights, Tex., 503 U.S. 115, 120 (1992); City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985).

In this case, there is no question that Peterson was acting under color of state law. To satisfy the second prong of his prima facie case, Dennen alleges that Peterson's release of Citus was an excessive use of force in violation of Dennen's Fourth Amendment right to be free from unreasonable searches and seizures. Alternatively, Dennen argues that even if there was no seizure in this case, his Fourteenth Amendment due process rights were violated

by Peterson's conduct. Finally, Dennen contends that the City of Duluth is also liable because its failure to incorporate specific guidelines regulating the use of police dogs constitutes a municipal policy or custom that resulted in a deprivation of his Fourth or Fourteenth Amendment rights.

### 1. Claims Against Officer Peterson

#### a. Fourth Amendment violation

The Supreme Court has held that "all claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989). The threshold issue in this case, however, is whether Dennen was seized for Fourth Amendment purposes. If he was not seized, then Dennen's Fourth Amendment rights were not abridged.

Determining whether a seizure has occurred requires a fact-intensive, and necessarily imprecise, inquiry. See United States v. McKines, 933 F.2d 1412, 1419 (8th Cir. 1991). While no bright-line rules exist, it is clear that a seizure does not take place simply because a police officer approaches an individual to ask him or her questions. See Florida v. Bostick, 501 U.S. 429, 434 (1991); Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968) (noting that not all interactions between police officers and citizens constitute seizures for purposes of the Fourth Amendment). A seizure occurs only when a person's freedom of movement is restrained by means of physical force or show of authority. United States v. Mendenhall, 446

U.S. 544, 553 (1980). If a police officer only asserts his or her authority, the suspect's submission to that authority is required before a seizure may be deemed to have taken place. California v. Hodari D., 499 U.S. 621, 626 (1991). In Brower v. County of Inyo, 489 U.S. 593 (1989), the Court further clarified that a use of force must be intentionally applied to constitute a seizure. Id. at 597.

Dennen does not identify the precise moment at which he was allegedly seized. Dennen hints that a seizure might have occurred either when Peterson made the U-turn and began to approach him or when Peterson identified himself with Citus leashed at his side. In both instances, Dennen's argument that a seizure occurred rests on the notion that Peterson was asserting his authority. In the first instance, however, Peterson did not turn on his patrol vehicle's lights or its siren when he made the U-turn. Accordingly, there were no objective indications that he was asserting his authority. The mere fact that Dennen may have subjectively felt apprehension at Peterson's decision to turn the patrol vehicle around is insufficient to constitute an assertion of authority. Thus, no seizure could have occurred at the moment that Peterson turned his patrol vehicle around.

Even if Officer Peterson's U-turn could somehow be characterized as an assertion of authority, Dennen obviously did not submit to this assertion. Similarly, although there is no question that Officer Peterson asserted his authority when he identified himself and commanded Dennen to come out of the woods, Dennen did not submit to this assertion. Accordingly, under Hodari D., no seizure can be deemed to have occurred at either point.

Dennen also argues that a seizure occurred when Officer Peterson and Citus got out of the patrol car to pursue him as he was running away. Again, if this action is considered an assertion of authority, Dennen did not submit to this assertion and under Hodari D. no seizure occurred. Dennen suggests, however, that the mere act of allowing Citus to exit the patrol car without a leash constitutes a "deployment" of the dog which, in itself, should be considered a use of force. To support this argument, Dennen relies on Vathekan v. Prince George's County, 154 F.3d 173, 178-79 (4th Cir. 1998).

Dennen's reliance on Vathekan is misplaced. In Vathekan, a police officer released a police canine in a house with specific instructions to bite and hold a burglary suspect. See id. at 178. Although the police canine eventually found and bit an innocent bystander who was in an upstairs bedroom of the house, the court reasoned that a seizure occurs even when an unintended person or thing is the object of the detention or taking. Id. (quoting Brower, 489 U.S. at 596). The key fact in that case, however, was that the police officer intentionally deployed the canine to find and apprehend persons in the house. Dennen stretches the reasoning of Vathekan too far by arguing that the case somehow stands for the proposition that release of a police canine, under any circumstances and without an instruction to bite and hold a suspect, is a per se use of force.

A person may only be seized by "a governmental termination of freedom of movement through means intentionally applied." Brower, 489 U.S. at 597 (emphasis added). There is no evidence to suggest that Peterson intended for Citus to apprehend Dennen.

Peterson has testified, in fact, that he did not bring Citus with him to track or apprehend Dennen. Additionally, although Citus did run ahead of Peterson for a brief moment, Peterson immediately recalled Citus and leashed him. Accordingly, under Brower, no seizure could have occurred.

Dennen's final argument is that Citus actually made physical contact with him before Peterson recalled the dog. Even assuming that such contact did occur, however, the Brower Court's intentionality requirement still poses an insuperable hurdle for Dennen. Accordingly, the Court finds that no seizure occurred and that Dennen's Fourth Amendment rights were not abridged. Summary judgment on Dennen's constitutional claims against Peterson is, therefore, warranted.

Alternatively, even if Dennen was seized for the purposes of the Fourth Amendment, Peterson's conduct was not unreasonable under the circumstances. "[T]he 'reasonableness' of a particular seizure depends not only on when it is made, but also on how it is carried out." Tennessee v. Garner, 471 U.S. 1, 7-8 (1985). Determining the constitutionality of a particular seizure requires courts to balance the nature and quality of the intrusion against the countervailing importance of the governmental interests allegedly justifying the intrusion. Garner, 471 U.S. at 8 (citations omitted).

Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, the inimitable facts and details of a given seizure are of foremost importance. See Garner, 471 U.S. at 8-9 (noting that the question is

"whether the totality of the circumstances justifie[s] a particular sort of . . . seizure"). As the Supreme Court has emphasized, however, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989) (citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . . [and] allowance [must be made] for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving." Id. at 396-97 (citations omitted).

In this case, although Citus was off leash when Peterson and Citus exited the patrol vehicle, Peterson has testified that he released Citus only for his own personal safety. Given that Peterson had only a few moments to make a decision and that it was late at night in a neighborhood that was reputed to have a high level of criminal activity, the Court finds that Peterson's release of Citus was justified. Additionally, the fact that Dennen was running away from Peterson escalated the tensions of the situation. The Supreme Court has stated that "[h]eadlong flight–whenever it occurs–is the consummate act of evasion." Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Because "unprovoked flight is simply not a mere refusal to cooperate[,] . . . [a]llowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right[s]." Id. Thus, pursuant to Graham, Peterson could reasonably employ some degree of force or threat thereof to effect an investigatory stop, and his release of Citus, without instructions to apprehend Dennen, was

reasonable.

b. Fourteenth Amendment violation

Dennen argues that even if his Fourth Amendment rights were not infringed, Peterson's conduct violated Dennen's due process rights. Dennen's argument fails. The "Constitution . . . does not purport to supplant traditional tort law." County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998). Only "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level" that is actionable in a substantive due process claim. Id. at 849. "[W]hen unforseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough . . . to spark the shock" necessary to support a due process claim. Id. at 853 (citations omitted); Feist v. Simonson, 36 F. Supp.2d 1136, 1144 (D. Minn. 1999) (Montgomery, J.) (stating that to support a due process claim, "a plaintiff must show that the officer's actions in causing the injury constituted an abuse of executive power . . . clearly unjustified by any legitimate objective of law enforcement"). In short, a claim for excessive use of force under the Fourteenth Amendment is only viable in the most egregious of circumstances.

In this case, viewing the evidence in the light most favorable to Dennen, at most Dennen has established that Peterson may have been negligent because he should have known that Citus had a propensity to be aggressive. A police officer's negligence, however, is insufficient to support a claim under the Fourteenth Amendment. See Lewis, 523 U.S. at

849 (noting that "liability for negligently inflicted harm is categorically beneath the threshold of Constitutional due process"). Accordingly, Dennen's claims under the Fourteenth Amendment fail as a matter of law.

c. Qualified immunity

Even if Peterson violated Dennen's constitutional rights, Dennen must also show that Peterson was not protected by qualified immunity to succeed on his claims. Generally, police officers who are performing discretionary functions are shielded from liability for civil damages so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Smithson v. Aldrich, 235 F.3d 1058, 1061 (8th Cir. 2000) (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987) (noting that government officials are protected if they reasonably believed that their conduct was lawful "in light of clearly established law and the information possessed" by them at the time of the alleged incident)). Because qualified immunity is immunity from suit rather than a mere defense to liability, the question of whether an officer is protected by qualified immunity must be resolved at the earliest possible stage in the litigation. See Saucier v. Katz, 533 U.S. 194, 200-01 (2001).

Determining whether an officer is entitled to the protection of qualified immunity is a two-step process. See Ware v. Morrison, 276 F.3d 385, 387 (8th Cir. 2002); Washington v. Normandy Fire Protection Dist., 272 F.3d 522, 526 (8th Cir. 2001). Initially, a court must decide whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the

facts alleged show the [officer's] conduct violated a constitutional right." Saucier, 533 U.S. at 201. If a constitutional violation can be demonstrated by the facts alleged, the court must undertake the second step of the process and decide if the constitutional right was clearly established. Id. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." Id. (quoting Anderson, 483 U.S. at 640). If the right was not clearly established, then the officer's actions are protected by qualified immunity.

As the Court has already held, Peterson's conduct did not violate Dennen's constitutional rights. However, even if Peterson's conduct had violated Dennen's constitutional rights, Dennen has proffered no argument that the contours of those rights were so clear that a reasonable officer in Peterson's position should have known that releasing Citus violated those rights. Dennen has not alleged that any statute or regulation constrained Peterson's conduct. Although it was the policy of the Duluth police department that an officer should use the "lowest reasonable level" of force necessitated in a given situation, use of a police dog is not explicitly incorporated into the policy. (See Cherne Dep. Ex. 3.) Dennen concedes that the lack of such a policy resulted in confusion over how deployment of a dog ranks on the continuum of force. (See Pl.'s Opp'n Mem. at 22.) This concession is fatal to Dennen's claims against Peterson. Dennen has pointed to no legal authority suggesting that, in the absence of a command to track or apprehend, the release of an off-leash police canine would under all circumstances infringe Dennen's constitutional rights.

Accordingly, Peterson was not "'plainly incompetent or . . . knowingly violat[ing] the law.'" Hunter, 502 U.S. at 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)), and summary judgment against Dennen is warranted.

**2. Claims against Duluth**

Dennen contends that Duluth failed to properly incorporate the use of police canines into its use-of-force policy and that this failure inordinately increased the risk that police canines would be improperly used. A municipal entity may be held liable under 42 U.S.C. § 1983 only if a "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of rights." Board of County Comm'rs v. Brown, 520 U.S. 397, 400 (1997). The plaintiff's constitutional injuries must, in other words, be caused by a municipal policy, custom, or practice. See id. at 403; Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 166 (1993); Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 663 (1978).

In order to succeed with a claim that a failure to incorporate specific guidelines in a policy resulted in a constitutional violation, Dennen must show that: (1) there was a continuing, widespread, persistent pattern of unconstitutional conduct; (2) deliberate indifference to or tacit authorization of such conduct by the city's policymaking officials after notice to the officials of the misconduct; and (3) Dennen's injuries were caused by the city's custom or practice. Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citations omitted). As Defendants point out, Dennen has failed to make any arguments or

present any evidence to meet his burden. Instead, he relies on Watkins v. City of Oakland, 145 F.3d 1087 (9th Cir. 1998) to argue that where a police department does not incorporate the use of police canines into its use-of-force guidelines, the absence of such guidelines, standing alone, permits a claim against the city. In Watkins, however, the court relied, in part, on the fact that "[i]n the five years prior [to the incident at issue] police dogs had found and bit thirty-six commercial burglary suspects." Id. at 1091. Accordingly, in that case, the requirement that there be a continuing and widespread problem of constitutional magnitude was met.

In this case, Dennen has provided no evidence that such a continuing and widespread problem existed or that any Duluth policymaker was indifferent to such a problem if it did exist. Thus, Dennen's constitutional claims against Duluth fail as a matter of law.

### C. State-Law Claims

Dennen seeks damages for negligent infliction of emotional distress and negligence. Although Dennen does not explicitly address these claims, he suggests that Peterson was negligent in releasing Citus because he should have known that the dog had a propensity to be aggressive. The Complaint alleges that Duluth should be held jointly and severally liable for such negligence.

#### 1. Claims against Peterson

Peterson asserts that he is protected from liability against Dennen's state law negligence claims by official immunity. In Minnesota, "a public official charged by law

duties which call for the exercise of judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Elwood v. Rice County, 423 N.W.2d 671, 677 (Minn. 1988) (citation omitted); Janklow v. Minn. Bd. of Examiners for Nursing Home Adm'rs, 552 N.W.2d 711, 716 (Minn. 1996). In other words, an official is shielded by official immunity unless he or she acts in a ministerial capacity or with malice. See Kelly v. City of Minneapolis, 598 N.W.2d 657, 664 (Minn. 1999); Janklow, 552 N.W.2d at 716; Pletan v. Gaines, 494 N.W. 2d 38, 42 (Minn. 1992).

Generally, a police officer who performs her or his duty to prevent a crime and enforce the law is exercising discretion. Johnson v. Morris, 453 N.W.2d 31, 42 (Minn. 1990) (citing Elwood, 423 N.W.2d at 678)). "Malice in the context of official immunity means intentionally committing an act that the official has reason to believe is legally prohibited." Kelly, 598 N.W.2d at 663 (citation omitted).

Dennen provides no argument or evidence to show that Peterson was acting either in a ministerial capacity or with malice. Accordingly, Dennen appears to concede that his state-law claims against Peterson are precluded by qualified immunity. Even if Dennen has not conceded the point, however, in the absence of any argument or evidence to the contrary, summary judgment in favor of Peterson is appropriate. As the Minnesota Supreme Court has stated,

> [o]fficial immunity is provided because the community cannot expect police officers to do their duty and then to second-guess them when they attempt to conscientiously do it. To expose police officers to civil liability whenever a

> third person might be injured would . . . tend to exchange prudent caution for timidity in [an] already difficult job.

Pletan, 494 N.W.2d at 41. In this case Peterson has testified that he was not using Citus to track or apprehend Dennen. Instead, he released Citus off leash because he was reasonably concerned by the potential dangers inherent in a tense and rapidly evolving situation. To second-guess that decision now, especially without the benefit of any detailed argument by Dennen, would defeat the policy underlying qualified immunity. The Court therefore grants Peterson's Motion for Summary Judgment on Dennen's state law claims.

**2. Claims against Duluth**

Although Duluth is not protected by official immunity directly, it argues that it is entitled to protection from liability for any violation of state law by vicarious official immunity. See Pletan, 494 N.W.2d at 42; Davis v. Hennepin County, 559 N.W.2d 117, 122 n. 4 (Minn. App. 1997). Vicarious official immunity may protect a municipality if the effect of denying immunity would be to chill the individual official's independent judgment. See Olson v. Ramsey County, 509 N.W.2d 368, 372 (Minn. 1993); Leonzal v. Grogan, 516 N.W.2d 210, 214 (Minn. App. 1994).

Again, Dennen provides no explicit argument and alleges no facts that would militate against applying the doctrine of vicarious official immunity in this case. The Court therefore finds that the doctrine is applicable and shields Duluth from any liability on Dennen's state law claims. Accordingly, the Court grants Duluth's Motion for Summary Judgment on

Dennen's state law claims.

## CONCLUSION

For the foregoing reasons, and upon all of the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Dismissal and Summary Judgment (Clerk Doc. No. 36) is **GRANTED** and counts I, IV, and V of the Complaint are **DISMISSED**; and

2. Counts II and III of the Complaint are **DISMISSED** with prejudice as withdrawn.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 1, 2002

Paul A. Magnuson
United States District Court Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*